UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                                                                    Chapter 11

GII Industries, Inc., f/k/a                                                  Case Nos.:    04-27013-CEC
Grace Industries, Inc., et al.,                                                                  04-27015-CEC
                                                                                                              06-42964-CEC
                                     Debtor.                                                         06-42966-CEC
                                                                                                              06-43325-CEC
                                                                                         Jointly Administered
------------------------------------------------------------x
GII Industries, Inc., f/k/a Grace Industries, Inc.,
                                                                                         Adv. Pro. No. 07-1464-CEC
                                     Plaintiff,

-against-

New York State Department of Transportation,

                                     Defendant.
------------------------------------------------------------x

## DECISION

APPEARANCES:


Thomas Baylis, Esq.                                            Steven L Banks, Esq.
C. Nathan Dee, Esq.                                           Mark D. Rosenzweig, Esq.
Cullen & Dykman, LLP                                        NYS Office of Attorney General
100 Quentin Roosevelt Blvd                                120 Broadway, 24th Floor
Garden City, NY 11530                                       New York, NY 10271
Attorneys for Plaintiff                                          Attorneys for Defendant




CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter presents the following issue: does an alleged letter agreement between Grace Industries, Inc. ("Grace") and the New York State Department of Transportation (the "DOT"), wherein Grace agreed to limit the amount of compensation sought from the DOT in connection with the reconstruction of a portion of the West Side Highway in Manhattan, constitute an enforceable contract, and, if so, can it be rescinded? For the following reasons, the agreement is unenforceable because it was not supported by consideration, and Grace is awarded partial judgment on this issue pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7052.

## Jurisdiction

This Court has jurisdiction of this core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and 1334, and the Eastern District of New York standing order of reference dated August 28, 1986. This decision constitutes the Court's findings of fact and conclusion of law to the extent required by Bankruptcy Rule 7052.

## Background

The following facts are undisputed.

On May 12, 1998, the DOT awarded public construction contract D257543 (the "Contract") to Grace for the reconstruction of Route 9A in New York, New York, also known as the West Side Highway, from West 25th Street to West 40th Street (the "Project"). (JPTO[1] Ex. A ¶¶ 1, 2.) The Contract was divided into two parts: the "A" portion described the work to be done, and the "B" portion set the deadline for completion of the Project. (JPTO Ex. A ¶¶ 4-6.) The Contract required the Project to be completed in five stages, ensuring the continuous flow of

---

[1] "JPTO" refers to the Joint Pre-trial Order dated January 15, 2009.

traffic.  (JPTO ¶ 1, Ex. A ¶ 9.)  If the Project was completed ahead of schedule, Grace would be entitled to a bonus for each day it was completed early.  (JPTO Ex. A ¶¶ 6, 55.)  On the other hand, if Grace did not timely complete the Project, Grace would be penalized for each day that the work continued past the deadline.  (JPTO Ex. A ¶¶ 6, 55.)

On November 10, 1998, during the first stage of the Project, Grace discovered a large pipe that was not included on the DOT's site information, bid documents, or drawings.  (JPTO ¶ 3, Ex. A ¶¶ 15, 17, 18.)  The pipe was a "differing site condition" ("DSC") according to the 1995 New York State Standard Specifications (the "Specifications"), which are the procedures and requirements that govern the Contract.  (JPTO ¶ 3, Ex. A ¶ 19.)  By letters dated November 11, 1998 and November 24, 1998, Grace notified the DOT of the DSC, and that it could not continue working on the Project until further direction from the DOT.  (JPTO Ex. A ¶¶ 22-24.)  By letter dated December 4, 1998, the DOT instructed Grace to work on a modified second stage of the Project, and, approximately six months later, the DOT determined that the pipe was owned by the Long Island Railroad, and needed to remain in service throughout the duration of the Project.  (JPTO ¶ 5, Ex. A ¶¶ 27-30, 32.)

On November 9, 1999, Grace requested additional compensation because of the delay and additional work caused by the DSC.  (JPTO ¶ 6, Ex. A ¶ 39.)  The DOT rejected the request for additional compensation, asserting that it was not made in compliance with the Specifications.  (JPTO ¶ 6, Ex. A ¶ 40.)

On April 25, 2000, a meeting was held in Albany between Grace and New York State (the "State") to address Grace's request for an adjustment to the compensation set forth in the Contract, and for an extension of time in which to complete the Project.  (JPTO Ex. A ¶¶ 41, 42.)

As a result of this meeting, the State issued Order On Contract ("OOC")[2] 7, to address the time delays on the Project that flowed from the DSC, and which extended the deadline for the Project's completion by 579 days. (JPTO ¶ 7, Ex. A ¶¶ 53, 54.) Thereafter, on July 13, 2000, the State issued OOC 8, establishing a force account in the amount of $3 million available for the DOT to pay Grace's estimated additional costs incurred as a result of the DSC and the Project's restaging[3]. (JPTO ¶ 8, Ex. A. ¶¶ 43, 45, 58.)

Between April 2000 and November 2000, the DOT and Grace negotiated the actual labor costs incurred by Grace as a result of the DSC. (JPTO Ex. A ¶ 62.) On October 6, 2000, the DOT directed Grace to calculate its labor losses based on the "critical path method" ("CPM"), which is a DOT mandated project management tool used to schedule critical project activities. (JPTO Ex. A ¶¶ 34, 63.) Thereafter, in December 2000, Grace submitted its second request for a contractual adjustment. (JPTO ¶ 13, Ex. A ¶ 64.) However, the DOT did not accept Grace's use of the CPM, and over the next seventeen months, the parties negotiated the amount of Grace's costs. (JPTO Ex. A ¶¶ 66, 67.)

On July 17, 2001, Grace received $1,650,000, the maximum allowable bonus for completing the Project ahead of schedule. (JPTO ¶ 2, Ex. A ¶ 56.)

---

[2] An order on contract is used to fund a modification to a DOT highway construction contract. (JPTO Ex. A ¶¶ 48, 49.) After an OOC is approved by the necessary DOT officials, it is submitted to the Office of State Comptroller ("OSC"). (JPTO Ex. A ¶ 50.) When the OOC is approved by the OSC, the funding becomes available to the DOT to authorize payment to the contractor. (Tr. 1/15/09 at 142.)

[3] "Restaging" means modification of how the work on a project is staged, and can result in additional costs, such as extended overhead costs (e.g., project supervision, maintaining a field office on site for a longer period); additional costs associated with the unanticipated movement of equipment and laborers; and costs for idle equipment. (Def.'s Post-Trial Mem. of Law 5.)

On May 6, 2002, a meeting was held between the DOT and Grace, during which the parties agreed to use a "total cost method" ("TCM") to calculate Grace's claim for additional costs incurred from the restaging. (JPTO Ex. A ¶¶ 70, 71.) The TCM required Grace to determine what its total costs were between January 9, 1999 and December 5, 2000 (the "Claim Period"), including labor, materials, and equipment, plus profit and overhead, and compare these actual costs to the amounts that the State had paid Grace for work performed during the Claim Period. (JPTO ¶ 15, Ex. A ¶¶ 64, 73.) A second meeting was held on July 10, 2002, during which the DOT agreed to compensate Grace for reasonable, actual, and verifiable costs incurred as a result of the restaging of the Project. (JPTO Ex. A ¶¶ 74, 75.)

Between July 10, 2002 and February 5, 2003, the parties negotiated the calculation of Grace's costs, and on February 7, 2003, Janice McLachlan, an attorney with the DOT's Office of Legal Affairs, proposed a settlement of $7,112,438.60. (JPTO Ex. A ¶¶ 76, 77, 79.) Grace alleges that this settlement amount reflects a $1 million reduction of the costs for which Grace would receive payment, which Grace agreed to in exchange for payment of half of the settlement amount within six weeks of the execution of the settlement agreement, and the remaining half within thirteen weeks. (JPTO ¶ 17.) Grace alleges that this payment schedule was a material term of the settlement, and a condition subsequent to the settlement. (JPTO ¶ 17.) The DOT denies that the settlement was reduced by $1 million in exchange for a set payment schedule. (JPTO ¶ 17.)

On January 23, 2003, the State accepted the Project as complete. (JPTO ¶ 16, Ex. A ¶ 110.)

By letter dated March 3, 2003 (the "Agreement"), John Grady, of the dispute resolution unit of the DOT's Office of Construction, set forth the proposed settlement. (JPTO ¶ 18, Ex. A ¶¶ 81, 83.) The Agreement provided that the DOT would pay Grace "actual, reasonable, and verifiable costs," incurred as a result of the DSC, including restaging, in an amount not to exceed $7,112,438. (JPTO ¶ 18, Ex. A ¶ 82.) Of this amount, $2.7 million had previously been paid through the force account established by OOC 8. (JPTO ¶¶ 18, 20, Ex. A ¶ 86.) The Agreement provides, in pertinent part:

> This offer was made solely in the interest of compromising all project disputes and is contingent upon [Grace's] execution of a release of all claims associated with [the Contract]. It also must be understood that the agreement is based upon these issues in principle, and that the dollar amounts to be paid will be actual, reasonable and verifiable costs based upon records that must be reviewed for accuracy and compliance with the contract provisions . . . . The release will be forwarded for your execution with the final agreement.

(Def.'s Ex. G; Pl.'s Ex. 65.)

On March 7, 2003, Vincent DeIorio, attorney for Grace, countersigned the Agreement on behalf of Grace. (Def.'s Ex. G; Pl.'s Ex. 65 at 9.)

On June 6, 2003, Richard A. Grace, president of Grace, executed the general release contemplated by the Agreement. (Def.'s Ex. M.) On that same date, OOC 18 was issued by the DOT, and approved by the OSC, establishing a force account of $4.45 million. (JPTO Ex. A ¶¶ 84-87.) These funds, together with the force account previously established by OOC 8, were to be the source of any payments made by the DOT pursuant to the Agreement. (JPTO Ex. A ¶ 86.)

On March 14, 2003, based upon a complaint filed with the OSC alleging improper payments to Grace, the OSC commenced an audit of payments made to Grace under the Contract, including those made pursuant to OOC 8.  (JPTO Ex. A ¶¶ 78, 88, 89, 92.)

On January 29, 2005, the OSC issued a report in connection with the audit, directing the DOT to recalculate Grace's insurance costs related to its labor on the Project, and recommending a $1.5 million reduction of the payments to be made to Grace pursuant to the Agreement.  (JPTO ¶¶ 21, 22, Ex. A ¶¶ 89, 93.)  Subsequently, the DOT notified Grace that it was reducing the amounts requested by Grace for extended field overhead, restaging, and equipment because of the OSC's audit findings.  (JPTO ¶ 22.)

In response to the OSC audit, Sourin Nour, an assistant engineer with the DOT in charge of the Project, was assigned the task of verifying Grace's actual labor costs related to the restaging.  (JPTO ¶ 23, Ex. A. ¶¶ 97, 98.)  After analyzing Grace's certified payroll records, Nour concluded that Grace's labor costs totaled $11,117,354.  (JPTO ¶ 23, Ex. A ¶ 101.)  That amount is more than $4 million higher than the amount used by the State in calculating the amount due to Grace as a result of restaging, and is approximately $3 million less than the amount claimed by Grace as its labor costs for the Claim Period.  (JPTO ¶ 23.)

On December 6, 2004, Grace filed a voluntary petition under chapter 11 of the Bankruptcy Code.

On August 15, 2007, Grace commenced the instant adversary proceeding asserting a breach of contract claim against the DOT, seeking $7,870,619.87 in damages, and seeking a declaratory judgment with respect to the rights and obligations of the parties pursuant to the Agreement.

7

On September 12, 2007, the DOT issued OOC 20, amending the Contract and calculating Grace's claim for additional compensation in the amount of $7,064,615. On January 31, 2008, the OSC approved OOC 20. Grace disputes the calculations of its costs determined in OOC 20, and maintains that it incurred costs of approximately $14,184,118 due to the DSC and the necessary restaging of the Project.

On October 1, 2007, the DOT interposed an answer to the complaint, including a counterclaim asserting that Grace had received more than its actual, reasonable, and verifiable costs, and seeking to recover the excess amount paid to Grace. On January 29, 2008, Grace filed an amended complaint, seeking damages of $10,680,503 for the DOT's breach of contract, and again seeking a declaratory judgment with respect to the Agreement.

On March 12, 2008, the DOT interposed an answer to the amended complaint, and again asserted a counterclaim seeking to recover excess payments made to Grace. On March 24, 2008, Grace interposed an answer to the DOT's counterclaim.

On July 22, 2008, the Court issued a consent order assigning the disputes between the DOT and Grace to mediation. The parties have reached an impasse regarding the issue of enforceability of the Agreement, and whether it may be rescinded. A four day trial was conducted in connection with the parties' request for a determination of these issues. At the conclusion of the DOT's presentation, Grace moved, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, to dismiss the DOT's affirmative defense that the Agreement limits Grace's recovery to $7,112,438. The Court reserved decision on this motion, and continued the trial with respect to the other issues. This decision constitutes a determination of Grace's motion, taking into consideration all of the evidence presented at trial.

## Discussion

Federal Rule of Civil Procedure 52(c), made applicable pursuant to Bankruptcy Rule 7052, provides, in pertinent part:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 52(c); Fed. R. Bankr. P. 7052.

Grace argues that the DOT has not met its burden of establishing that the Agreement is an enforceable contract, pursuant to which Grace's claim for additional compensation as a result of the DSC is limited to $7,112,438. Grace argues that because the DOT did not furnish consideration in support of the Agreement, Grace's agreement to limit its recovery for actual, reasonable, and verifiable costs, which Grace contends exceed $14 million, to $7,112,438, is not enforceable. The DOT argues that the Agreement is supported by consideration on both sides, in that the DOT agreed to pay actual, reasonable and verifiable costs attributed to the delay caused by the DSC, and Grace limited its recovery to $7,112,438.

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) (quotation marks omitted). Consideration is defined as "some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other." Hamer v. Sidway, 124 N.Y. 538, 545 (1982) (quotation marks omitted). An agreement is not supported by valid consideration "[i]f the promisor loses nothing, and the promisee acquires nothing." Granite Partners, L.P. v. Bear,

9

Stearns & Co., 58 F. Supp. 2d 228, 252 (S.D.N.Y. 1999).  Consequently, the promise to do what one is already bound to do does not constitute consideration to establish an enforceable contract. Id.; Tierney v. Capricorn Investors, L.P., 592 N.Y.S.2d 700, 703 (N.Y. App. Div. 1993).

The Agreement is not an enforceable contract under New York law because the DOT did not furnish any consideration in exchange for Grace's promise to cap its claim for additional costs incurred by Grace as a result of the DSC.  The DOT argues that the Contract did not require the DOT to compensate Grace for additional work and costs, including restaging, incurred as a result of the DSC, and that the consideration furnished by the DOT is the promise to pay these costs, up to $7,112,438, to the extent Grace proves them to be actual, reasonable, and verifiable.  This argument must be rejected because it is not supported by the terms of the Contract or the testimony adduced at trial.

The Specifications, which the parties agree are incorporated into the Contract, and govern the Contract, provide for a dispute resolution process in the event Grace seeks additional compensation for extra work.  (Tr.[4] 1/15/09 at 21.)  Sections 109-05D of the Specifications provide that certain actual and reasonable expenses, such as additional labor and material expenses, are recoverable by a contractor in the event of a time related dispute.  (Pl.'s Ex. 16; Tr. 3/19/09 at 74.)  Section 109-16 of the Specifications permits the contractor to recover various costs, such as costs resulting from restaging, in the event a DSC is discovered.  (Pl.'s Ex. 52; Tr. 3/19/09 at 74.)

Philip Salerno, the DOT's Director of Construction for the region in which the Project was situated, testified that the Specifications govern all contracts with the DOT, and that the

---

[4]"Tr." refers to the transcript of the trial held on the date indicated.

Specifications allow a contractor to obtain adjustments to the contract, such as additional compensation, when the State is responsible for a project's delay. (Tr. 1/15/09 at 21-24.) Mr. Salerno testified that Grace's original request for compensation was denied because Grace had not complied with the recordkeeping requirements set forth in the Specifications, such as filing forms in accordance with the Manual Uniform Recordkeeping ("MURK forms"). (Tr. 1/15/09 at 26-27.) Mr. Salerno further testified that he had determined "that the State was responsible for some time-related dispute," that the DSC caused the restaging of the Project, and that pursuant to the Specifications, Grace was entitled to receive compensation on account of their restaging costs incurred as a result of the DSC. (Tr. 1/14/09 at 28, 50-51, 59-60.)

Additionally, John Grady, who was in charge of the DOT's Dispute Resolution Unit at the time the dispute with Grace arose, and is currently the Assistant Director of Construction for the DOT, testified, expressly, that Grace was entitled to compensation as a result of the delay caused by the DSC, including restaging costs. (Tr. 1/16/09 at 4.)

The testimony of Mr. Salerno and Mr. Grady, and the terms of the Specifications, establish that Grace was entitled, pursuant to the Contract, to recover actual, reasonable and verifiable costs incurred as a result of the DSC. The only outstanding issue was the amount of the costs. Given that the DOT was already obligated to compensate Grace for the costs incurred as a result of the DSC, the DOT's promise in the Agreement to reimburse Grace for these same costs does not constitute consideration to support a determination that the Agreement is an enforceable contract. The Agreement provides a $7,112,358 cap on Grace's recovery, which only benefits the DOT in the event Grace can prove its costs are greater than that amount. On the other hand, the Agreement did not obligate the DOT to pay Grace a minimum amount or to make

11

payment by any deadline. (Tr. 1/16/09 at 81.) In short, the DOT received the benefit of the $7,112,438 cap, without obligating itself to do anything it was not otherwise bound to do under the Contract.

The DOT argues that it furnished consideration in support of the Agreement by waiving Grace's obligations under the Contract to submit MURK forms, or to otherwise strictly comply with the Contract's recordkeeping provisions in order to recover the actual, reasonable, and verifiable costs incurred as a result of the DSC. However, this argument is not supported by the terms of the Agreement, which specifically require Grace to prove its actual, reasonable, and verifiable costs in accordance with the Contract's provisions. Therefore, Grace's burden of proof to recover the additional compensation and reimbursement of costs incurred as a result of the DSC remained the same under the Agreement as under the Contract.

The DOT argues that, without the Agreement, Grace had, at most, the right to pursue a claim for the additional compensation caused by the DSC, and that, if the DOT rejected this claim, Grace would have to bring an action against the State in the New York Court of Claims. The DOT argues that it therefore furnished consideration by its agreement to pay Grace's actual, reasonable, and verifiable costs incurred as a result of the DSC, obviating the need for Grace to commence an action to recover these amounts in the Court of Claims.[5] This argument fails because, even with the Agreement, if the parties cannot agree on the amount of the actual, reasonable and verifiable costs incurred as a result of the DSC (as they did not), Grace would still be required to commence an action to obtain payment (as it did). Furthermore, the DOT has

---

[5] The State agrees that, although the Court of Claims would be the appropriate venue for such an action in the absence of a bankruptcy, this Court has jurisdiction to determine this dispute in the context of Grace's bankruptcy, and that this is a core proceeding. (JPTO ¶40.)

conceded that, even though the DOT entered into the Agreement, the DOT would not be able to pay Grace its actual, reasonable, and verifiable costs if the OSC decided not approve the payments. (Tr. 3/19/09 at 21.) Therefore, in the event the OSC did not approve the payments (and, as a result of the audit, the OSC in fact reduced the amounts payable to Grace by $1.5 million), Grace would be required to commence an action to recover those amounts. Indeed, Grace was required to commence this litigation to recover the amounts to which it asserts it is entitled.

Lastly, the DOT argues that, as consideration, it performed under the Agreement and made two payments to Grace totaling $4.5 million toward Grace's extended overhead costs. This argument must be rejected because the terms of the Agreement did not obligate the DOT to establish force accounts or to make estimated payments to compensate Grace for the extended overhead costs; the DOT made no promise in this regard that would constitute consideration for Grace's agreement to cap its claim. Indeed, $2.7 million of this amount had been paid to Grace prior to the signing of the Agreement. See United Res. Recovery Corp. v. Ramko Venture Mgmt., Inc., 584 F. Supp. 2d 645, 656 (S.D.N.Y. 2008) (past consideration is not consideration unless the written agreement unequivocally states the past consideration given as consideration). Additionally, these payments do not constitute consideration because, to the extent the payments were made on account of actual, reasonable, and verifiable costs due to the DSC, Grace was already entitled to recover these costs pursuant to the Specifications and the Contract. Moreover, the $4.5 million was paid to Grace from the force accounts established by the orders on contract. It is the DOT's position that contractors do not hold title, or have any entitlement, to the funds in these accounts. (Def.'s Post-Trial Mem. of Law 30.) Therefore, in the event DOT or OSC

decided that Grace had not substantiated its costs, or was not otherwise entitled to any additional compensation, Grace, according to the DOT, would be required to return those amounts to the DOT, and in this proceeding the DOT seeks the return of the amounts the DOT contends was overpaid to Grace from the force accounts. (Def.'s Post-Trial Mem. of Law 30.) As such, the payments made to Grace from the force accounts do not constitute consideration for Grace's undertaking under the Agreement to cap its claim for additional compensation under the Contract.

This Court concludes that the Agreement was not supported by consideration because the Agreement did not provide Grace with any benefit to which it was not otherwise entitled. Accordingly, the Agreement is not an enforceable contract under New York law.

It should be noted that the parties disputed whether parol evidence may be used to interpret the terms of the Agreement. The DOT took the position that the Agreement was a fully integrated document, and that parol evidence may not be considered. For the reasons stated above, the Agreement was not supported by consideration. Given this determination, it is unnecessary to address whether, as Grace contends, parol evidence should be considered in the interpretation of the Agreement; whether the DOT breached the Agreement; or whether the Agreement may be rescinded.

14

## Conclusion

For the foregoing reasons, the Agreement is not an enforceable contract, and Grace's motion pursuant to Rule 52(c) is granted.

Dated: Brooklyn, New York
      September 23, 2009

*/s/Carla E. Craig*
CARLA E. CRAIG
Chief United States Bankruptcy Judge