UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

In re                                              Chapter 11

GII Industries, Inc., f/k/a                        Case Nos.:    04-27013-CEC
Grace Industries, Inc., et al.,                                  04-27015-CEC
                                                                 06-42964-CEC
                          Debtor.                                06-42966-CEC
                                                                 06-43325-CEC
                                                   Jointly Administered
----------------------------------------------------------x
GII Industries, Inc., f/k/a Grace Industries, Inc.,
                                                   Adv. Pro. No. 07-1464-CEC
                          Plaintiff,

-against-

New York State Department of Transportation,

                          Defendant.
----------------------------------------------------------x

<u>DECISION</u>

APPEARANCES:

Thomas Baylis, Esq.                     Steven L Banks, Esq.
C. Nathan Dee, Esq.                     Mark D. Rosenzweig, Esq.
Cullen & Dykman, LLP                    NYS Office of Attorney General
100 Quentin Roosevelt Blvd              120 Broadway, 24th Floor
Garden City, NY 11530                   New York, NY 10271
Attorneys for Plaintiff                 Attorneys for Defendant

CARLA CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the complaint of GII Industries, Inc. f/k/a Grace Industries, Inc. ("Grace"), seeking payment from the New York State Department of Transportation ("DOT" or "State") for amounts allegedly due on account of services Grace rendered to the DOT under a contract to reconstruct a portion of the West Side Highway in New York City. A bench trial was conducted to determine the appropriate cost methodology to calculate Grace's damage claim against the DOT, and to determine whether Grace was entitled to prejudgment interest on that claim. For the reasons set forth below, Grace is instructed to calculate its damages using the total cost method, and is granted prejudgment interest on its damage claim from May 8, 2003.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334(b), and the Eastern District of New York standing order of reference dated August 28, 1996. Pursuant to the Joint Pre-Trial Order ("JPTO"), the parties have stipulated that this matter is a core proceeding under 28 U.S.C. §157(b). (JPTO at ¶ 73.) See 28 U.S.C. §157 (c)(2). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

The following facts are undisputed.

On March 26, 1998, the State of New York, acting by and through the DOT, began soliciting bids for a contract (the "Contract") to reconstruct Route 9A, the West Side Highway, from West 25th Street to West 40th Street in Manhattan (the "Project"). (JPTO at ¶¶ 1, 4.) The DOT awarded Grace the Contract on May 12, 1998. (JPTO at ¶ 1.)

The Contract contained over three hundred and seventy one items of work to be completed in five sequential stages.  (JPTO at ¶¶ 7, 8.)

The Contract divided the Project into an "A" portion and a "B" portion.  The "A" portion outlined the tasks Grace was to complete, and detailed the amount Grace would be paid for each item of work.  The "B" portion of the Contract concerned the timing of the Project, and set a completion date.  The Contract provided that Grace would be entitled to receive a bonus, or be required to pay a penalty, depending on whether the Project was completed before or after the Contract's completion date.  (JPTO at ¶¶ 2, 3.)

Grace was awarded the Contract on the basis of a bid consisting of an "A" portion of $43,744,312 and a "B" portion of 660 days with a $15,000 bonus or penalty for each day finished before or after the completion date.  (JPTO at ¶ 5.)

On November 10, 1998, during Grace's work on the first stage of the Project, Grace struck a 68-inch by 43-inch elliptical pipe.  The elliptical pipe, which extended across the highway, did not appear on the drawings or site information provided by the DOT.  (JPTO at ¶ 15.)

The following day, Grace sent a letter notifying the DOT of the discovery of the elliptical pipe.  In that letter, Grace informed the DOT that the pipe might affect the Project's schedule and requested that "T &M records be kept to reimburse" Grace for any "additional costs, losses, and expenses arising from and attributable to this changed condition."  (JPTO at ¶ 16; Ex. 5.)

On November 24, 1998, Grace sent a letter informing the DOT that the elliptical pipe was having a major impact on the Project's scheduling and was preventing Grace from progressing to Stage 2 of the Project.  Grace requested "guidance on how to proceed so that the DOT and Grace

Industries will be able to assess the impact on the "b" portion of this contract and maintain construction continuity."  (JPTO at ¶ 17; Ex. 6.)

On December 4, 1998, the DOT responded to Grace's letter dated November 24, 1998, instructing Grace to proceed to a modified stage 2.  The DOT explained that because the impact to the "B" portion of the Contract could not be assessed at that time, "[t]he progress of the work and the approved CPM schedule will be monitored closely for any delays and/or impacts to the "B" portion of the contract." [1]  (JPTO at ¶ 18; Ex. 7.)

On September 2, 1999, the State approved Order On Contract ("OOC") No. 2.[2]  OOC2 addressed the engineering and design issues associated with installing a diversion for the elliptical pipe.  (Ex. 9).

As a result of the elliptical pipe, the Project's original five stage plan was modified.  On January 31, 2000, Grace and the DOT met to discuss the restaging and the impact the restaging would have on the Project's CPM schedule. (JPTO at ¶ 25.)

The parties met again on April 25, 2000 to discuss a possible adjustment to Grace's compensation under the Contract, and a possible extension of time for Grace to complete the Project.  (JPTO at ¶ 26.)

On June 28, 2000, the DOT issued OOC7, which extended the "B" portion of the Contract by 579 calendar days because of the restaging of the Project.  (JPTO at ¶ 27; Ex. 13.)

---

[1] A CPM [critical path method] schedule "is a standard construction device used to plan activities of a construction project in a logical, orderly sequencing manner citing durations for different activities from the beginning of the job to the end.  A CPM is created by dividing the entire project into discrete and quantifiable steps; in turn, each step is allotted an estimated time for completion.  Ultimately, each step is arranged into a chronological sequence, thus revealing the anticipated length and structure of the entire construction schedule.  In addition to serving as a road map for the contractors to determine when and where their work fits into the overall construction sequence, the CPM also assists contractors in assessing their hiring and material purchasing needs."  Roberts & Schaefer Co. v. Hardaway Co., 152 F.3d 1283, 1287 (11th Cir. 1998).

[2] An order on contract constitutes an amendment to the contract.  See NEW YORK STATE DEPT. OF TRANSPORTATION, MANUAL FOR UNIFORM RECORDKEEPING ON CONSTRUCTION CONTRACTS (March 1996) (Ex. 49, p.2) ("The contract agreement and contract documents define work which is included in the project.  Revisions to this work require an amendment to the contract.  The order-on-contract is that amendment.")

On July 13, 2000, the DOT issued OOC8 to compensate Grace for its increased overhead costs beginning as of March 31, 2000 due to the Project's restaging.   Pursuant to OOC8, the State established a force account of $3,000,000. [3]  (JPTO at ¶ ¶28, 29; Ex. 12.)  OOC8 also provided that Grace gave proper notice of its delay claim.  (JPTO at ¶ 30.)

Between April, 2000, and November, 2000, the parties negotiated the actual labor costs incurred by Grace as a result of the restaging.  (SUF at ¶ 64.)[4]  However, the DOT rejected the CPM-based adjustment to the Contract that Grace proposed. (SUF at ¶ 67.)

Over the next seventeen months, Grace and representatives from the DOT attempted to reach a negotiated agreement regarding Grace's claim by comparing the resource loading from Grace's CPM schedule to Grace's costs attributable to the Project's restaging.  (JPTO at ¶ 32; SUF at ¶ 68.)

On July 13, 2001, Grace completed its work on the project.  (JPTO at ¶ 34.)   Grace earned the maximum allowable bonus under the amended "B" portion of the Contract, having completed the Project 110 days before the Contract's modified completion date.  On July 17, 2001, the State paid Grace its bonus of $1,650,000.  (JPTO at ¶ 35.)

During March, 2002, Grace completed its punch list for the Project.  Since that time, the West Side Highway has been fully operational.  (JPTO at ¶¶ 36, 37.)

On May 6, 2002, Grace and the DOT met in Albany to discuss what cost methodology should be used to calculate Grace's claim for additional compensation.  (JPTO at ¶ 38.)

---

[3] A force account is added to a contract to compensate a contractor for extra or additional work.  If a force account is used, the extra work is first added to the contract, "by order on contract, as a Force Account Estimate (FE).  After the force account work has been completed, a Force Account Actual (FA) shall be computed based on a summary of the daily records.  The FA shall be added to the contract by an order-on contract, and the FE shall be deleted in the same OOC." NEW YORK STATE DEPT. OF TRANSPORTATION, MANUAL FOR UNIFORM RECORDKEEPING ON CONSTRUCTION CONTRACTS (March 1996) (Ex. 49, p.20.)
[4] "SUF" refers to the Statement of Undisputed Facts.  See JPTO, Ex. A.

The parties met again on July 10, 2002 to continue discussions regarding methodologies of calculating Grace's claim for additional compensation. (SUF at ¶ 72.) From July 10, 2002 until February 5, 2003, Grace and the DOT continued to negotiate the calculation of Grace's claim for additional compensation. (JPTO at ¶ 39.)

The DOT officially accepted the Project as complete as of January 23, 2003 pursuant to a letter sent to Grace on January 29, 2003. (JPTO at ¶ 41.)

On March 3, 2003, John Grady, of the dispute resolution unit of the DOT's Office of Construction, sent a letter to Grace proposing to settle Grace's claims by paying Grace "actual, reasonable, and verifiable costs" incurred as a result of the elliptical pipe, including restaging costs, in an amount not to exceed $7,112,458. In re GII Industries, Inc., 416 B.R. 84, 88 (Bankr. E.D.N.Y. 2009). Although this letter was countersigned on behalf of Grace, it was found, in a decision issued in this proceeding, to be unenforceable against Grace because of a lack of consideration. Id. at 92.

In March, 2003, the Office of the State Comptroller (the "OSC") began an audit of the Project based upon a complaint filed by a former DOT employee who had worked on the Project, alleging that the DOT had made improper payments to Grace on the Project. (JPTO at ¶¶ 40, 42.)

In January, 2005, after completing its audit, the OSC issued a written report. In the report, the OSC directed the DOT to recalculate the amounts payable to Grace for the Project. (JPTO at ¶ 47; Ex. 21.) The OSC proposed disallowing nearly $3.3 million in costs claimed by Grace. (Ex. 21.)

On December 6, 2004, Grace filed a petition under chapter 11 of the Bankruptcy Code.

On August 15, 2007 Grace commenced this adversary proceeding against the DOT, seeking damages in the amount of $10.8 million as well as interest and attorney's fees.  (JPTO at ¶ 49.)  In its complaint, Grace sought compensation for labor, equipment and other related costs that were allegedly increased as a result of the Project's restaging.  Grace asserted that the restaging caused Grace to incur costs well in excess of the costs it anticipated when it bid on the Project under its original five stage design.

 The State filed its answer on October 1, 2007, alleging that Grace received more than its actual costs incurred on the Project and seeking to recover the excess amount paid to Grace. (JPTO at ¶ 50.)

On October 14, 2007, the DOT approved OOC 20, which amended the Contract based upon the State's calculation of the total outstanding compensation to which Grace was entitled, including amounts owed on account of the restaging, and reconciled these amounts against payments already made to Grace.  On January 31, 2008, the OSC approved OOC20.  (JPTO at ¶¶51, 53.)  OOC 20 noted that Grace disputed the State's calculation of its restaging claim.  (Ex. 14, p.5)

On January 29, 2008, Grace filed an amended complaint.  On March 12, 2008, the State filed its amended answer.  (JPTO at ¶¶ 52, 54.)

After a four day trial, this Court issued a decision dated September 23, 2009, holding that the March 3, 2003 letter agreement, which limited Grace's potential recovery, was unenforceable because of a lack of consideration.   In re GII Industries, Inc., 416 B.R. at 92.

In November, 2009, Grace and the DOT entered mediation.  After failing to reach an agreement, at the suggestion of the mediator, the parties requested the Court to determine the

appropriate cost methodology to calculate Grace's damage claim and whether Grace is entitled to prejudgment interest on any such damage claim.  (JPTO at ¶ 56.)

The Court conducted a bench trial on those issues at a series of hearings held between May 26, 2010 and July 27, 2010.  Post-trial briefing followed, and closing arguments were made on February 23, 2011.

## DISCUSSION

I.  <u>Grace's Right to Payment under the Contract</u>

The DOT asserts that, before addressing the appropriate methodology for calculating Grace's costs, and Grace's entitlement to prejudgment interest, the Court must first determine whether Grace may seek any additional compensation under the Contract.  The DOT asserts that the Contract required Grace to keep detailed daily records in compliance with the DOT's Manual for Uniform Record Keeping on Construction Contracts ("MURK records" or "Force Account Records") to substantiate any claim arising from the Project's restaging.  Since Grace did not keep MURK records, according to the DOT, Grace is not entitled to additional compensation, and the Court need not address cost methodologies or prejudgment interest.

Grace reads the Contract differently.  Grace asserts that it was not contractually obligated to maintain MURK records in connection with its restaging claim.  Alternatively, Grace contends that, if there was an obligation to maintain MURK records, the DOT either waived the requirement or is estopped from enforcing it.

Since Grace does not assert that it kept its records of costs attributable to the restaging of the Project in compliance with MURK, the threshold inquiry is whether the Contract requires Grace to maintain MURK records of the additional costs arising from the Project's restaging as a condition precedent to receiving additional compensation.

A.  <u>The Contract and the Specifications</u>

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."  <u>Cruden v. Bank of N.Y.</u>, 957 F.2d 961, 976 (2d Cir. 1992) (<u>citing Breed v. Ins. Co. of N. Am.</u>, 385 N.E.2d 1280, 1282 (N.Y. 1978)).  "[W]ords and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  <u>LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.</u>, 424 F.3d 195, 206 (2d Cir. 2005).

Article 13 of the Contract provides that, "[t]he Contractor agrees to make no claim for extras or additional costs attributable to any delays, inefficiencies, or interference in the performance of this contract," except in a few limited circumstances, including three situations outlined in Section 109-16 of the DOT's 1995 Standard Specifications (the "Specifications"), which set forth procedures and requirements governing the Contract.  These three situations are: 1) a differing site condition, 2) a suspension of work ordered by the engineer, or 3) a significant change in the character of the work ("Significant Change").  §109-16 (A).[5]

The DOT does not dispute that the discovery of the elliptical pipe constituted a differing site condition under Section 109-16 (A)(1).  (JPTO at ¶¶ 22, 23.)  Nevertheless, the DOT argues, Grace cannot receive additional compensation on account of the restaging because Article 5 of the Contract expressly permits the DOT to "alter the plans or omit any portion of the work as it may deem reasonably necessary for the public interest."[6]

---

[5] Unless otherwise indicated, citations in this section of this decision, to sections of §§109 and 110, are to provisions of the Specifications.
[6] Article 5 of the Contract also permits "allowances for additions and deductions with compensation made in accordance with the Standard Specifications. . ."

Grace asserts that it is entitled to additional compensation for its costs arising from the restaging, not only because the restaging was caused by a differing site condition, but because the restaging constituted a Significant Change. The Specifications provide that a Significant Change occurs, among other circumstances, "[w]hen the character of the work as altered differs materially in kind or nature from that involved or included in the original proposed construction." §109-16(A)(3)(iv)(A).

The evidence presented at trial establishes that the restaging did in fact constitute a Significant Change, entitling Grace to additional compensation for the costs incurred as a result of the restaging.  Stephen Weathers, an expert in construction scheduling and construction contract management, called by the DOT, testified that a change in the methodology of construction could constitute a Significant Change.  (Tr. 6/30/10 at 87: 6-9.)[7]  Here, the evidence showed that the change in methodology of construction for the Project caused by the restaging was drastic.  When Grace bid for the Contract, the Project was designed to be completed in five sequential stages.  (JPTO at ¶¶ 7, 8.)  However, after the discovery of the elliptical pipe, the five stage approach was abandoned.  Ultimately, the Project was completed in fourteen stages. (Ex. 129; Slides 1-14).  Not only were these stages smaller than the stages envisioned under the original Project, but the order in which they were completed was completely different.  Id.

For example, what had originally been the fifth and final stage of the Project was actually completed as the sixth, seventh, twelve, thirteenth, and fourteenth stages.  Id.  The fifth stage was transformed from a single stage on one piece of congruent land into four stages, requiring labor and equipment to be transported to and from other parts of the Project four different times.

---

[7] "Tr." refers to the trial transcripts from adversary proceeding 07-01464, ECF Docket Nos. 92, 94, 107, 109, 111, 113, and 120.  Citations to the transcript are by date, page number, and line.

Darrell Harp, former General Counsel of the DOT, and principal drafter of the Specifications,

testified for Grace, as follows:

> Q: Is there any question in your mind that there was - - the restaging that we're
> talking about in this case was a significant change in the character of the work
> under the standard specifications?
>
> A: None whatsoever. You went from a determination by the state to put it in
> certain stages to hopscotching all over the place.
>
>             *      *      *      *
>
> Q: In your years at the DOT, did you ever see a significant change in the character
> of the work, of the magnitude that was encountered by Grace on this project?
>
> A: No.

(Tr. 5/27/10 at 84: 2-8; 86: 1-4.)

While the substantive tasks that Grace completed under the Project did not change due to

the restaging, from a design and execution perspective, the restaged Project was radically

different from the original Project, and accordingly the restaging constituted a Significant

Change under the Specifications.

The Specifications provide that in the context of a Significant Change, "additional

compensation via order on contract(s) shall be made . . . for increased costs, if any, pursuant to

§109-05 B, New Item Charges, 1 (Agreed Price) or 2 (Force Account Charges)."  §109-

16(A)(3)(v).   Section 109-05(B)(1) and (2) provide two distinct methods by which Grace could

receive additional compensation for a Significant Change.  Section 109-05(B)(1) outlines the

agreed price approach  (the "Agreed Price Approach"), which permits the Commissioner to reach

agreed price adjustments to compensation as the Commissioner deems "to be just and fair and

beneficial to the State" for an event such as a Significant Change.  Under the Agreed Price

Approach, any agreed price must be based on "an estimated breakdown of charges listed in the

following paragraph 2. 'Force Account Charges,' unless some other basis is approved by the

Commissioner." Section 109-05(B)(1) makes no reference to any requirement that those charges be substantiated by MURK records.

Section 109-05(B)(2) sets forth a second method by which a contractor can receive additional compensation under the Contract. Under this approach (the "Force Account Approach"), a Contractor can be compensated for a detailed list of expenses (the same charges that any agreed price adjustment must be based upon) as long as they are substantiated by MURK records. See §109-05(C) (stating that payment for force account work will be made on the basis of MURK records).

The DOT takes the position that, by virtue of these provisions, the contractor is required to maintain MURK records as a condition precedent to receiving additional compensation, whether the parties are pursuing the Agreed Price Approach or the Force Account Approach. Grace, on the other hand, asserts that it had no obligation to keep MURK records as a precondition to receiving payment for restaging costs under the circumstances of this case.

The DOT is correct that compliance with the Contract's recordkeeping requirement is a condition precedent to recovery of additional compensation under the Contract. In A.H.A. General Construction, Inc. v. New York City Housing Authority, the Court of Appeals of New York explained that a similar notice and recordkeeping requirement in a public construction contract was not an exculpatory clause, but rather a "condition precedent[] to suit or recovery." 92 N.Y. 2d 20, 30-31 (1998). Under New York law, it is now "well established that strict compliance with the notice and damage documentation terms of municipal construction contracts is a condition precedent to recovery for such causes of action." Baker Heavy & Highway v. New York State Thru Authority, 2006 WL 6456416, at *4 (N.Y.Ct.Cl. 2006).

While Grace indeed must provide adequate records to properly substantiate its claims, under the facts of this case, the Contract did not require Grace to maintain records in the form prescribed by MURK as a condition precedent to recovering additional costs arising from the restaging of the Project.  To give all of the provisions in the Specifications meaning, the Contract and Specifications must be understood to provide that a contractor is not required to maintain MURK records while the parties pursue the Agreed Price Approach under Section 109-05(B)(1).

All of the evidence presented during the course of the trial points to the conclusion that the parties pursued the Agreed Price Approach to resolving Grace's claim for additional costs due to the Project's restaging for more than three years.  OOC20, received in evidence by stipulation for all purposes (JPTO at Ex. I), recounts the parties' ongoing efforts to reach an agreed price adjustment, at least through March, 2003, when the OSC commenced its audit.  The record is devoid of evidence that the parties ever sought to utilize the Force Account Approach with regard to compensating Grace for the Project's restaging costs.[8]  Indeed, the first step in the Force Account Approach under the DOT's Manual for Uniform Record Keeping on Construction Contracts (the "MURK Manual"), the establishment of a force account estimate, was never taken with respect to Grace's claim for restaging costs.  (MURK Manual, Ex. 49, p.20; see infra fn.3.) Whether because the Force Account Approach, with MURK recordkeeping, was not feasible, as Grace asserts, or because the Agreed Price Approach was more appropriate under the circumstances, the parties clearly followed the Agreed Price Approach, and not the Force Account Approach, to address Grace's claim for restaging costs.

The MURK Manual supports the conclusion that the Specifications do not require that MURK records be kept when the parties are pursuing the Agreed Price Approach.  The MURK

---

[8] By contrast, the parties did use the Force Account Approach to compensate Grace for its claim for extended overhead costs.  (Tr. 7/27/10 at 26: 8-22.)  Accordingly, Grace complied with the Specifications' requirements for Force Account work and furnished the State with MURK records to substantiate its extended overhead claims.

Manual makes no reference to any requirement that MURK records be kept as a component of the Agreed Price Approach.  Rather, the MURK Manual outlines two specific methods for substantiating costs under the Agreed Price Approach, neither of which involves MURK records. The MURK Manual provides that "[d]epartment specifications and procedures allow two options which may be used to review and accept Agreed Prices": 1) a price analysis prepared in accordance with §109-05F of the Specifications, or 2) a comparison to weighted average bid prices for similar type and quantity on other recently bid contracts.  (Ex. 49, p. 13).

The DOT, nonetheless, insists that §105-14(A), which sets forth the dispute resolution process for time related disputes, requires Grace to maintain MURK records, whether the Agreed Price Approach or the Force Account Approach to additional compensation is taken.  The DOT's interpretation of §105-14(A) is unpersuasive.  Section 105-14(A)(1)(b), by its terms, "cover[s] all such applicable events under §109-16," which includes a Significant Change.  Section 105-14(A)(4) provides, with respect to time related disputes, "that a Contractor must keep daily records of all labor, material, and equipment costs and hours incurred for the affected operations."  However, this provision contains no requirement that these records be maintained in compliance with MURK.  In fact, that same provision states that "[i]f there is a dispute as to records, the Contractor must follow the requirements of §105-14C," which requires a Contractor to maintain MURK records.  The Specifications in this regard are clear: as long as parties are pursuing the Agreed Price Approach, and there is no dispute as to records, MURK records are not required.

Given that the parties pursued the Agreed Price Approach through the Project's completion, and given that the DOT introduced no evidence at trial that it disputed the validity of Grace's records at any point during that process, the Contract did not require Grace to maintain

MURK records as a precondition to recovering payment for restaging costs. It is important to note that this construction of the Contract does not eliminate Grace's recordkeeping obligation. Under Article 13 of the Contract, Grace must maintain "detailed written records of the costs" for which it seeks to be compensated; however, Grace was not required to keep those records in compliance with MURK.

    B.   Waiver of Recordkeeping Requirements

Even if the Contract were interpreted to require Grace to maintain MURK records, the DOT waived any such requirement in connection with Grace's claim for compensation for costs attributable to the restaging of the Project. "Under New York contract law, 'any party to a contract may [impliedly] waive a provision of that contract.'" Calpine Energy Servs, L.P. v. Reliant Energy Elec. Solutions, LLC, (In re Calpine Corp.), 2009 WL 1578282, at *4 (Bankr. S.D.N.Y. 2009) (quoting In re Caldor, Inc.-NY, 204 B.R. 855, 861 (Bankr. S.D.N.Y. 1997)(alteration in original). "A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed." Alsens Am. Portland Cements Works v. Degnon Contracting Co., 222 N.Y. 34, 37 (1917). "[T]he intent to waive a right must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act." Orange Steel Erectors, Inc. v. Newburgh Steel Prod., Inc., 225 A.D.2d 1010, 640 N.Y.S.2d 283, 285 (App. Div. 1996).

The DOT argues that "[t]he trial evidence does not support a finding of any oral or written statement by representatives of NYSDOT, inside or outside of settlement discussions, which express an intention to waive the Contract's requirements. . ." (Def. Post-Tr. Mem. of Law, 16.) However, "under the doctrine of waiver, 'a party may, by

words or conduct, waive a provision in a contract to eliminate a condition in a contract that was inserted for [its] benefit." ESPN, Inc. v. Office of Com'r of Baseball, 76 F.Supp. 2d 383, 389 (S.D.N.Y. 1999) (quoting Oleg Cassini, Inc. v. Couture Coordinates, Inc., 297 F.Supp. 821, 830 (S.D.N.Y. 1969)(emphasis added).

For example, in In re Caldor, the Bankruptcy Court for the Southern District of New York held that a landlord, through its conduct over the course of a lease, waived a contractual provision requiring the tenant to give "prompt written notice" of the need for repairs. 204 B.R. 855. In that case, the landlord asserted that its obligation to repair the roof of the leasehold was obviated by the tenant's failure to give proper written notice as required under the lease. Id. at 861. In rejecting the landlord's argument, the court noted that, for over a decade, the landlord, without receiving written notice, continued to make repairs to the roof. Id. at 862. As a result, despite the absence of a single written or oral statement by the landlord indicating intent to waive the written notice requirement, the court held that the landlord's conduct over the life of the lease constituted a waiver of the provision. Id.

Similarly, in this case, the evidentiary record reflects that the DOT never insisted, or even suggested, that Grace must maintain MURK records as a condition precedent to obtaining compensation under the Contract. Like the landlord in Caldor, the DOT did not express an intent to rely upon these contractual provisions. While mere delay in the enforcement of a right, by itself, is not necessarily sufficient to infer waiver, Peck v. Peck, 232 A.D.2d 540, 649 N.Y.S.2d 22, 23 (App.Div. 1996), the DOT's conduct in this case clearly manifested an intent to waive any such requirement.

The State's issuance of OOC20 in October, 2007, contradicts the DOT's argument that, in the absence of MURK records, Grace is not entitled to compensation for its restaging costs, or at the very least, constitutes an unmistakable waiver of any such recordkeeping requirement.  Under OOC 20, approved by the OSC after the commencement of this action, the State amended the Contract to include a provision which calculated Grace's entitlement to additional compensation, inclusive of amounts owed on account of the restaging. [9] (Ex. 59; Ex. 14.)  In issuing OOC20, the State modified the Contract to provide that Grace, without submitting MURK records, was entitled to compensation for restaging costs.

This conclusion is entirely consistent with the determination earlier in this proceeding that the March 3, 2003 letter agreement was unenforceable due to a lack of consideration.  In re GII Industries, Inc., 416 B.R. at 92.  There, the DOT's argument that it furnished consideration for Grace's agreement to cap its damage claim by waiving Grace's obligation under the Contract to submit MURK records was rejected, because the March 3, 2003 letter agreement specifically required Grace to prove its "actual, reasonable and verifiable costs based upon records that must be reviewed for accuracy and compliance with the contract provisions."  (Ex. 14, p. 7.)  Accordingly, "Grace's burden of proof to recover additional compensation . . . remained the same under the [March 3, 2003 letter agreement] as under the Contract."  In re GII Industries, Inc., 416 B.R. at 91.

In subsequently issuing OOC20, however, the State expressly acknowledged Grace's right to receive additional compensation for restaging costs, and quantified the

---

[9] OOC20 acknowledges that Grace's compensation under OOC20 was "not considered by [Grace] to be fair compensation and satisfactory resolution of [its] claim, causing their withdrawal from the Settlement, thus leaving open the door for future legal action on [Grace's] part."  (Ex. 14, p.5).

amount that, according to the DOT, Grace was entitled to receive.  (Ex. 14, p.6.)  Under

OOC20, Grace's entitlement to compensation of restaging costs is not conditioned on

submission of MURK records.  The State's approval of OOC20 unequivocally

demonstrates that if the Contract required MURK records to be kept in connection with

Grace's claim for restaging costs, the State waived that requirement.

II.  Method of Calculating Grace's Costs

"It is fundamental to the law of damages that one complaining of injury has the burden

of proving the extent of the harm suffered."  Berley Ind., Inc. v. City of New York, 45 N.Y.2d

683, 686 (1978).  Damages are calculated to the extent a party's costs "were increased by the

improper conduct, and its recovery will be limited to damages actually sustained."  Thalle Const.

Co., Inc. v. Whiting-Turner Contracting Co., Inc., 39 F.3d 412, 417 (2d Cir. 1994) (quoting Peter

Scalamandre & Sons, Inc. v. Village Dock, Inc., 187 A.D.2d. 496, 496, 589 N.Y.S.2d 191, 191

(App. Div 1992)).   However, the New York Court of Appeals has recognized that "recovery will

not necessarily be denied a plaintiff when it is apparent that the quantum of damage is

unavoidably uncertain, beset by complexity or difficult to ascertain."  Berley Ind., Inc., 45

N.Y.2d at 687.  See also Public Constrs, Inc. v. State of New York, 55 A.D.2d. 386, 373, 390

N.Y.S.2d 481, 485 (App. Div. 1977) ("The impossibility of establishing a precise formula for

computing damages should not foreclose the claimaints' clear right to recover.") (quotations

omitted).  The determination of the appropriate methodology to use to calculate damages is a

question of law.  Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009-

10 (2d Cir. 1991).

Here, Grace seeks damages incurred as a result of the Project's restaging, which Grace

asserts delayed work and rendered its performance on the Project less productive and less

efficient than anticipated, thereby increasing costs.  In <u>Thalle</u>, the Second Circuit explained that, in the context of delay damages, "the most precise method of calculating" damages in construction cases "involves tracing particular cost items to the delay" or  using "a related method [that] measures damages as the difference between total costs when delays are taken into account and total costs absent delays."  39 F.3d at 417.  However, the court noted that "[o]ften [] these two methods prove prohibitively difficult or speculative."  <u>Id.</u>  In those circumstances, courts frequently turn to the "total cost" method.  <u>Id.</u> (<u>citing Najjar Indus., Inc. v. City of New York</u>, 87 A.D.2d 329, 331-32, 451 N.Y.S.2d 410, 413-14 (App. Div. 1982).

Under the total cost method, the injured party, while limited to recovering damages actually sustained, is relieved "from the necessity of matching each individual increase in cost to a discrete breach."  <u>All-States Commc'ns, Inc. v. New York Tel. Co.</u>, No. 96-CV-5740, 1997 WL 729033, at *2 (S.D.N.Y. 1997).  Instead, the total cost method measures damages by calculating the "difference between the contract price . . . and . . . total job costs."  <u>Thalle</u>, 39 F.3d at 417 (<u>quoting Wolff,</u> 946 F.2d at 1010).  The court then apportions damages "according to each party's responsibility for them."  <u>Id.</u>  In applying the total cost method, New York courts require use of the contract price rather than bid estimates or bid figures.  <u>Thalle</u>, 39 F.3d at 417.  Thus, "[a]s long as the contract price is available . . . the total cost approach is feasible."  <u>Id.</u>

The State argues that the total cost method cannot be used to calculate Grace's costs in this case because it is not provided for in the Contract or the Specifications.  This argument, however, misses the mark.  The Contract and the Specifications do not prescribe any particular method of calculating delay damages.  As Darrell Harp, former General Counsel of the DOT and the principal drafter of the Specifications, testified, the Specifications do not set forth particular methodologies because "you need the flexibility to adopt a method and a system that is—will

provide a fair and adequate and hopefully timely resolution of any claim." (Tr. 5/27/10 at 94: 6-8.) Mr. Harp testified that he recalled approximately five different cases in which the total cost method was used to resolve contractor claims during his tenure at the DOT. (Tr. 5/27/10 at 95:16-21.) Accordingly, the fact that neither the Contract nor the Specifications expressly provide for use of the total cost method does not operate as a bar to the use of that method in this case. Instead, the relevant inquiry is whether use of the total cost method is warranted under New York law on the facts of this case.

Based on the evidence introduced at trial, Grace met its burden of proving that the total cost method is the only feasible method to calculate the costs Grace incurred as a result of the restaging. Because the impact of the restaging was so pervasive, and because the Contract is a unit price contract, it is impossible to identify with specificity the particular costs that Grace incurred due to the restaging.[10]

In Wolff, the Second Circuit found that use of the total cost method was required in circumstances similar to those presented here. 946 F.2d 1003. There, a subcontractor sought damages resulting from the modification of the sequence of the subcontractor's work. Id. at 1005. The court found the revision of the sequence of work "significant for two reasons: first, it delayed [the subcontractor's] mechanical work, and second, it made [the subcontractor's] work less efficient. . ." Id. Reversing the district court, the court determined that the total cost method should be used to calculate the subcontractor's damages. Id. at 1010.

As discussed in Section I.A., the evidence at trial showed that Grace was not able to complete the Project in its original five sequential stages because of the discovery of the elliptical pipe. Rather, the Project was restaged, and ultimately completed in fourteen stages, and

---

[10] A unit price contract is a type of itemized construction contract. A more detailed discussion of unit pricing and its significance in this case appears at pp.22-23 infra.

in a different order than originally contemplated.   (Ex. 129; Slides 1-14.)  This restaging

required the modification of the number, order, and physical size of the Project's stages, thereby

decreasing Grace's productivity and efficiency, and increasing Grace's costs.

Vincent Riverso, a construction consultant, testifying as an expert witness, explained that

a contractor's costs are based on anticipated productivity.  (Tr. 5/27/10 at 40:4-5.)   When the

physical size of the work areas of a project's stages are reduced, he explained, a contractor loses

productivity because it is forced to shorten the lengths of the runs for its equipment.  (Tr. 5/27/10

at 40:7-11.)  John Haran, a civil engineer at the DOT, who testified as an expert for the State,

concurred that the size of a Contractor's work area impacts productivity.  (Tr. 6/29/10 at 97: 7-

9.)

Other witnesses corroborated the testimony of these experts.  Stephen Kalijian, Grace's

chief operator, testified that under the original project, "[y]ou set up the paving machine and you

keep moving for the whole length of the job which is a little over three quarters of a mile.  Now

instead of doing that you're going 100 feet or 150 feet, and you're stopping and you're

dismantling your equipment."  (Tr. 5/26/10 at 123: 8-12.)  Paul Duarte, former Project

Superintendent, testified that the reduction in the physical size of the stages prevented Grace

from operating on long stretches, as originally planned, and instead required Grace to complete

the project "in bits and pieces."  (Tr. 5/26/10 at 51: 3.)  Grace would "get jammed up" because it

"needed real estate to continue."  (Tr. 5/26/10 at 49:16; 49: 10.)   As a result, Mr. Duarte

explained, Grace would "sit there and try to figure out places where we could go to work and try

to maintain something."  (Tr. 5/26/10 at 49:12-13.)

The restaging of the Project had other negative effects on Grace as well.  Restaging not

only affected how Grace used its equipment on the Project, but also limited Grace's available

workspace, forcing Grace, at times, to deviate from the original plan by using different equipment to accommodate the space. (Tr. 5/26/10 at 137: 8-15.) Restaging also increased the number of the stages, forcing Grace to move to different segments of the Project more frequently. This increased movement led to extra traffic crossovers, (Tr. 6/29/10 at 140: 3-16), which negatively impacted Grace's efficiency. (Tr. 6/29/10 at 19: 6-14.) Mr. Duarte testified that the restaging forced Grace to move traffic several additional times, requiring approval each time, and additional delays. (Tr. 5/26/10 at 50: 4-15.)

Grace's labor costs were also increased. While certain changes to the Contract required Grace to add specific labor, such as additional flagmen to control traffic, (Tr. 6/28/10 at 128: 4-7), the restaging pervasively affected Grace's deployment of its labor force throughout the Project. The negative effect was acknowledged in OOC7, issued by the OSC to amend the Contract's completion date.[11] In OOC7, the State wrote:

> [A]ctivities that were shown in the original baselines as concurrent. . . are now consecutive because of the restaging. An example is the excavation of the northbound roadway in Stage 2/3. The original schedule indicated the work in both stages to be done in 3 block increments from W 27th to W 39th Streets all concurrently (i.e. 4 excavation crews) in 15 days. However, due to the delay caused by tidegate N45, only 2 crews were utilized in Stage 2/3A and another 15 days to be utilized in Stage 2/3B, resulting in 30 days to accomplish the work originally slated to be accomplished in 15 days. As this situation occurred in several other activities and durations were broken into the revised staging, a new completion date of June 29, 2001 results, as a result of the resequencing. . .
>
> *        *        *        *
>
> In an effort to keep the schedule, the contractor moved into Stage 2/3 north of W.33rd Street with a reduced workforce. While this reduced workforce continued the construction of the project, it could not maintain the schedule, due to the work space limitations.

(Ex. 13.)

---

[11] While OOC7, by extending the B clock, addressed the damages that Grace would have incurred as a result of the delay had it been required to pay a penalty, or forfeited its opportunity to earn a bonus, under the Contract's original schedule, OOC7 did not address additional costs incurred as a result of restaging. (Ex. 13.)

The evidence established that the increased costs and inefficiencies caused by the restaging occurred throughout the Project. When a discrete task is added to a project, such as the installation of the diversion for the elliptical pipe, the costs incurred as a result can be identified and traced. Where, as here, the damages arise from a contract-wide decrease in efficiency and productivity caused by restaging, "tracing particular cost items to the delay" is "prohibitively difficult" and "speculative." Thalle, 39 F.3d at 417. This is particularly so given the sheer number of tasks impacted by the restaging of the Project.

The difficulty in tracing Grace's increased costs to specific items is exacerbated by the fact that the Contract is a unit price contract. Mr. Eager, Grace's expert accounting witness, explained that a unit price contract is an itemized contract that determines how the contractor will be paid by "allocating a specific unit price per item completed." (Tr. 6/28/10 at 81: 20-23.) Under a unit price contract, the project is divided into "pay items." (Tr. 5/27/10 at 41: 10- 25; 42: 1.) Mr. Kalaijian testified that each pay item corresponds to a type of work to be done, such as excavation, or a category of costs, such as the installation of pipes. (Tr. 5/26/10 at 82: 24-25; 83: 1-4.) A unit price contract specifies "quantities," and how much of each pay item the project will require. (Tr. 5/26/10 at 83:5-10.) Mr. Eager further explained that the unit price of each pay item is then "determined based on an average" by dividing the total cost of an item by the quantity of that item. (Tr. 6/29/10 at 83: 1-15.)

When bidding on a unit price contract for a project requiring staging, Mr. Kalaijian testified that the contractor first calculates the unit price for the pay items in each stage "as if the stage was a job on its own." (Tr. 5/26/10 at 84: 8-10.) Then, the contractor determines a unit price for the entire project by taking a weighted average of the unit prices in each individual

stage.  (Tr. 5/26/10 at 84: 10-12.)  As a result, the final unit price per pay item reflects the varying size and complexity of the pay item as performed in each stage.  (Tr. 5/26/10 at 90:4-13.)

Thus, because the Contract is unit priced, the costs of all of the tasks in each stage are necessarily interconnected.  Because the price of each pay item was calculated as an average, changes in the unit price for a pay item in a particular stage of the Project affected the unit price for that pay item across the entire Project.  (Tr. 5/27/10 at 46, 47, 48; 6/28/10 at 156, 166.)  Here, the effects of the restaging were pervasive, and the averages upon which the Contract is based were therefore impacted across the board.  As a result, segregating the costs of work impacted by restaging is "prohibitively difficult" and necessarily "speculative."  Thalle, 39 F.3d at 417.

Finally, Grace asserts that the DOT's instructions to Grace to calculate its claim using various cost methodologies, including the total cost method, over the course of the parties' several years of negotiating, is evidence that the total cost method should be used in this case.  The DOT objected to the introduction of any evidence relating to the parties' discussions concerning the costs incurred by Grace as a result of the Project's restaging, contending that Federal Rule of Evidence 408 ("FRE 408") bars all such evidence.  However, as discussed above, on the facts of this case, the total cost method is required as a matter of law.  See Wolff, 946 F.2d at 1010; Thalle, 39 F.3d at 417.  To reach this conclusion, it is not necessary to consider whether the State instructed Grace to calculate its claim using the total cost method.  For this reason, the parties' evidentiary dispute is not addressed.

For all these reasons, the application of the total cost method is warranted under New York law in this case. Accordingly, the parties are instructed to use the total cost method to calculate Grace's costs resulting from the restaging of the Project.

III. Prejudgment Interest on Grace's Claim

Under New York law, "prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract." In re Tender Loving Care Health Services, Inc., 2009 WL 5218598, at *9 (Bankr. E.D.N.Y. 2009) (citing Adams v. Lindblad Travel, Inc., 730 F.2d 89, 93–94 (2d Cir. 1984); Julien J. Studley, Inc. v. Gulf Oil Corp., 425 F.2d 947, 950 (2d Cir. 1969)). The DOT asserts, however, that the New York State Finance Law and the Contract provide that Grace is not entitled to prejudgment interest in this case.

Section 179-f of the New York State Finance Law, entitled "Determination of eligibility for payment of interest on amounts owed to contractors," sets forth the parameters of the State of New York's obligations to contractors with regard to prejudgment interest on public contracts. [12] Section 179-f (1) provides that "[e]ach state agency which is required to make a payment from state funds pursuant to a contract and which does not make such contract payment by the required payment date shall make an interest payment to the contractor in accordance with this article…" In §179-f(2), the statute specifies that "the required payment date shall be . . . in the case of final payments on highway construction contracts seventy-five days. . . after receipt of an invoice for the amount of the contract payment due."

Section 179-f(2) (a), however, extends the seventy-five day payment date, and therefore, the date when a contractor's entitlement to prejudgment interest begins to accrue, in the event that "the state comptroller in the course of his audit determines that there is reasonable cause to believe that payment may not properly be due, in whole or in part." The DOT contends that the

[12] "Section 179-f" refers to Section 179-f of the New York State Finance Law.

OSC audit of the Project, begun in March, 2003, after the Project was accepted as complete, based upon a complaint filed by a former DOT employee, fits within the ambit of this provision. (See Ex. 21.)

On the basis of its audit, the OSC concluded that Grace overbilled for its work, and as a result, the OSC proposed disallowing nearly $3.3 million of the costs claimed by Grace. The OSC identified several specific areas where it found that Grace overstated its costs. The most significant example of overbilling, according to the OSC's review, were the costs Grace claimed for its unemployment insurance and workers' compensation insurance. The OSC concluded that Grace's miscalculations of these insurance costs resulted in Grace overbilling the DOT by approximately $1.8 million. The OSC also reported that its audit revealed that Grace overbilled the DOT by more than $540,000 for its equipment costs, and that Grace received over $1.5 million in compensation in connection with costs for timber sheeting and rodent control, which were not supported by sufficient documentation. (Ex. 21.)

Grace argues that the OSC's review does not toll the accrual of prejudgment interest under Section 179-f of the New York State Finance Law on two grounds. First, Grace argues that the OSC conducted a review, not an audit. Second, Grace argues that in any event, "reasonable cause to believe the payment may not properly be due," as required by §179-f (2)(a), did not exist because the team that conducted the review was inexperienced and unqualified and failed to follow generally accepted government accounting standards ("GAGAS") or generally accepted accounting principles ("GAAP").

In support of its argument that no OSC audit was conducted, Grace points to the fact that the document that resulted from the review is titled "report." Other parts of the document use the term audit, but ultimately, whether the OSC conducted an audit or a review need not be

determined.  The glaring deficiencies of the OSC's audit render it an insufficient basis for the

OSC to "determine[] that there is reasonable cause to believe" that payment to Grace was not

due.    N.Y. State Fin. Law §179-f(2)(a).

First, it is undisputed that the auditors who conducted the review had minimal experience

auditing public construction contracts.  (Tr. 6/28/10 at 9: 24-10: 11; 7/27/10 at 64: 11-14.)  The

lack of the auditor's experience is noted under the "Assumptions/Constraints" heading on the

OSC's audit plan: "Construction unit currently consists of two auditors, Janet Smith, and Lori

Russo.  This unit is newly formed, and knowledge of auditing construction payments is still

being developed."  (Ex. 55.)

The auditors also failed to use appropriate methods in conducting the audit.  The auditor

in charge, Janet Smith, testified that the audit was to be conducted in accordance with GAGAS.

(Tr. 6/28/10 at 14:15-23.)  Yet her team manager, Mr. Brennan, testified that the audit was not

performed in accordance with GAGAS. (Tr. 7/27/10 at 69:7-10, 72:6-9.)   In addition to the

OSC's failure to comply with GAGAS, overwhelming evidence was presented at trial

demonstrating that the OSC audit team repeatedly failed to take the necessary steps to ensure that

its findings were accurate.

The most notable example of the OSC's failure to use appropriate auditing methods in

conducting the audit was its approach to calculating Grace's employment and workers'

compensation  insurance costs, which the OSC labeled in its report as "the most significant area"

where Grace overbilled its costs.  (Ex. 21, p.3.)  The OSC concluded that Grace's

miscalculations of these insurance costs resulted in Grace overbilling the state by approximately

$1.8 million.  Id.

In reaching this conclusion, Mr. Brennan testified that the audit team "computed [an] overall rate" to determine the cost of Grace's insurance.  (Tr. 7/27/10 at 88: 22.)  Mr. Brennan explained that, even though "[t]he specifications call for actual cost," it would have been extremely difficult to calculate the actual cost, and as a result, "we tried to use an effective rate across all the years and all the dollars."  (Tr. 7/27/10 at 88:15-25.)  The OSC settled on a rate, which Mr. Brennan acknowledged he thought, at the time, to be a low rate for a heavy construction company's worker's compensation insurance costs.  (Tr. 7/27/10 at 133: 13-15.) The decision to apply an estimated "effective" rate to calculate Grace's insurance costs was made despite the availability of all of the records needed to calculate how much Grace actually spent on employment and worker's compensation insurance.  (Tr. 7/27/10 at 139: 12-18; 140: 10-14.)   Mr. Brennan testified that the audit team elected to apply this estimated rate instead of using Grace's records to calculate Grace's actual costs, because "[w]e wanted them to compute the rate and tell us what it should be."  (Tr. 7/27/10 at 140: 15-16.)

This approach to calculating Grace's insurance costs was heavily criticized by Mr. Eager, Grace's expert accounting witness.   Mr. Eager, who has conducted over fifty audits of unit price construction contracts, testified that the use of estimates was not justifiable under these circumstances.  Mr. Eager explained that actual costs are always preferable to estimated costs, (Trial Tr. 6/28/10 at 118: 12-16), and that when conducting an audit of a completed project, there is no reason to use estimated costs because the contractor's actual costs are available.  (Tr. 6/28/10 at 132: 22-25; 133: 1-7.)  During her testimony, Ms. Smith, the lead auditor on the Project, also testified that, when auditing a contractor's workers' compensation and insurance rates, the most accurate method is to review the contractor's actual cost documents.  (Tr. 6/28/10 at 53: 12-17.)  Given that the OSC elected to use an estimate of Grace's insurance costs, which

the audit team manager admitted was low, rather than calculate Grace's actual costs, in

contravention of both the Specifications and, according to Mr. Eager, proper auditing practices,

the OSC's most significant negative finding is entirely unreliable.

The testimony at trial also demonstrated significant deficiencies in the approach used by

the OSC audit team in arriving at its finding that Grace was overcompensated by the State for the

installation of temporary timber sheeting.  The OSC, during its audit, identified four instances

where the engineer in chief either submitted false or suspect certifications to process payments

for temporary timber sheeting, totaling more than $1.5 million.  (Ex. 21, p.4.)  Based on these

faulty certifications, the OSC determined that Grace was not entitled to that compensation.

The evidence presented at trial established that the OSC's approach in making this

determination was flawed in several significant respects.   First, in reaching this conclusion, the

OSC relied on information received from Tom Bowers, a former engineer in chief ("EIC") of the

Project.  (Tr. 7/27/10 at 141: 19-23.)  Although Mr. Bowers served as the EIC at the time the

certifications in question were made, he was not the EIC when the installation of the timber

sheeting was actually performed.  (Tr. 7/27/10 at 145: 8-146: 16.)  The OSC's reliance on

information received from Mr. Bowers is questionable, however, not only because he lacked

firsthand knowledge of the timber sheeting work, but because his alleged falsification of records

was the impetus for the OSC to conduct the audit of the Project in the first place.  (Tr. 7/27/10 at

62: 6-15.)  In addition to information received from Mr. Bowers, Mr. Brennan testified that, in

determining how much timber sheeting was used on the Project, his audit team relied heavily on

information from the Inspector Daily Reports ("IRs").  (Tr. 7/27/10 at 141: 16-22.)  This reliance

on IRs is called into question by the OSC's 2006 audit investigating the DOT's payments on

public construction contracts, where the OSC concluded that IRs "generally lacked the details needed to verify the contractors' claims."  (Ex. 59, p.2.)

Despite Mr. Bowers's lack of credibility, or any actual knowledge of the timber sheeting work performed by Grace, and the OSC's acknowledgment that IRs cannot be relied upon to verify a contractor's claim, the OSC auditors still elected not to consult other information sources that could easily have established the accuracy or inaccuracy of Grace's timber sheeting billing.  Mr. Brennan testified that the OSC never spoke with Grace's timber sheeting subcontractor to determine whether the timber sheeting in question was provided, or with any representative of Grace to determine how much timber sheeting was actually used.  (Tr. 7/27/10 at 141:3-14).  Mr.  Brennan also testified that the OSC never contacted John Haran, the EIC who preceded Mr. Bowers on the Project, and who had firsthand knowledge of the phase of the Project in which timber sheeting was used.  (Tr. 7/27/10 at 144: 8-14; 146: 9-14.)  Because of the auditors' failure to make any attempt to substantiate these findings, they provided the State no basis to conclude that payments were not due Grace.

Although the OSC's findings with respect to these two aspects of the Project constituted the majority of the items for which the OSC concluded that Grace was overcompensated, Grace's expert witness, Mr. Eager, testified that the other findings made by the OSC's audit team were equally flawed.  Mr. Eager credibly testified that the OSC's failure to use actual costs throughout its audit, and the auditors' failure to understand the distinction between direct job costs and overhead, resulted in the OSC's erroneously finding that Grace overbilled its equipment costs.  (Tr. 6/28/10 at 118: 11-16; 127: 9-128: 19; 130: 13-22.)   Given these extensive deficiencies, the audit provided no basis for the OSC to "determine[] that there is cause

to believe that payment may not properly be due, in whole or in part."  N.Y. State Fin. Law §179-f(2)(a).

The State's argument that the Contract and the Specifications bar Grace from recovering prejudgment interest is equally unavailing.  Section 110-01 of the Specifications states that "[i]f the Department unjustifiably fails to pay the final payment within the prescribed seventy (75) calendar days, it may be required to pay interest for each day in excess of seventy (75) calendar days."  Section 110-01 also provides that the DOT is permitted a thirty (30) day inspection period, after final acceptance of the project, before the seventy five day clock begins to run.

The DOT accepted the Project as complete on January 23, 2003.  (JPTO at ¶ 41.)  Adding together the thirty day inspection period, and the seventy five day processing period, the DOT was, at the latest, obligated to make final payment by May 8, 2003.  The State, however, argues that because, according to the DOT, Grace's claim for restaging costs was still outstanding at the time final payment became due, §110-01 of the Specifications tolls the State's final payment date.  (Def. Post-Tr. Mem. of Law, 28.)  The DOT's argument is without merit.  Under §110-01 of the Specifications, the date from which prejudgment interest would begin to accrue is not tolled by the mere existence of outstanding claims or disputes.  Section 110-01 of the Specifications suspends the State's final payment date, and the accrual of interest, only when a contractor fails to furnish the State with the necessary documentation to process a final payment, including documentation notifying the State of outstanding claims or disputes.  If a contractor provides the requisite notification, then the final payment date is not tolled.[13]

---

[13]Section 110-1 of the Specifications provides:

Section 179 of the State Finance Law requires the Department to make final payment on highway construction projects within seventy five (75) days after acceptance by the Commissioner.  If the Department unjustifiably fails to pay the final payment with the prescribed seventy five (75) calendar days, it may be required to pay interest for each day in excess of the seventy five (75) calendar days.

In order to enable the Department of Transportation to process the final payment properly and expeditiously the bidders are all advised that all of the following documents and submission, as the same may be

Accordingly, even if, as DOT contends, Grace's claim was outstanding at the time the Project was accepted as complete, this fact did not toll the Contract's final payment date under §110-01.  The DOT was in continuous negotiations with Grace concerning the claim prior to the time it accepted the Project as complete, and had indisputably received ample written notice of Grace's restaging claim, including a proposed adjustment to the Contract settling the claim.  (SUF at ¶ 65-67.)  To toll the final payment date under the Contract because Grace did not, at that time, submit a document noting its outstanding restaging claim, where the DOT was clearly aware of the claim would elevate form over substance.  Nor is such a result warranted by the statutory language of §110-01, which provides, with respect to the list of documents needed to process the final payment, that "the above list is general in nature, and every item may not be applicable to the contract."  Given that the DOT had previously received ample written notice of Grace's restaging claim, any requirement that Grace submit notification of that claim was either satisfied, or inapplicable under the circumstances.

In addition, under the New York State Finance Law, a public construction contract's final payment date is only tolled when "the commissioner of transportation determines that the

---

appropriate to this contract, are considered to be necessary to enable the processing of the final payment as described above.

      Outstanding Claims and Disputes
      Extras Work Cost Accounts
      Final Labor Affidavits (Forms AC 2947 & AC 2949)
      Approved Original Reproducibles
      Material Certifications
      Certified Payrolls
      FHWA Record of Materials, Supplies and Labor (Form FHWA 47)
      Tax Clearance for "Foreign" (out of State) Contractors, Corporations or entities
      DBE Subcontractors Payment Report (Form AAP-21)

      The Bidders are advised that the above list is general in nature, that every item may not be applicable to the contract and that other documents and submissions not shown above may be required to enable the processing of the final payment.  It should be noted that any time taken beyond the date of final acceptance to satisfy or furnish the above information shall extend the required payment date by an equal period of  time.
      The Department of Transportation, in accordance with §179 of the State Finance Law, has determined that a thirty (30) calendar day inspection period, after final acceptance of the project, is required for final payments after which time the seventy five (75) day interest-free processing period will commence.

contractor has failed to properly submit the necessary documents . . ." N.Y. State Fin. Law §179-f(2)(h) (emphasis added). The State introduced no evidence that the commissioner ever made such a determination in this case. Accordingly, because Grace complied with the requirements of the Contract and the Specifications, and the OSC's audit provided no "reasonable cause to believe" that payment was not due to Grace, in whole or in part, Grace is entitled to receive prejudgment interest from May 8, 2003.

CONCLUSION

For the foregoing reasons, Grace is instructed to calculate its claim arising from the Project's restaging using the total cost method and is granted prejudgment interest on its claim from May 8, 2003. A separate order will issue.



**Dated: Brooklyn, New York**
**October 6, 2011**

**Carla E. Craig**
**United States Bankruptcy Judge**